**KEMP JONES, LLP**
Don Springmeyer, Esq. (#1021)
3800 Howard Hughes Pkwy., 17th Floor
Las Vegas, NV 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001
E-mail: d.springmeyer@kempjones.com

**BURSOR & FISHER, P.A.**
Yeremey O. Krivoshey (*Pro Hac Vice Forthcoming*)
Brittany S. Scott (*Pro Hac Vice Forthcoming*)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ykrivoshey@bursor.com
         bscott@bursor.com

**DOVEL & LUNER, LLP**
Jonas Jacobson (*Pro Hac Vice Forthcoming*)
Simon Franzini (*Pro Hac Vice Forthcoming*)
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: (310) 656-7066
Email: jonas@dovel.com
       simon@dovel.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SHERRY MINER, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>       v.<br><br>TARGET CORPORATION,<br><br>                              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sherry Miner ("Plaintiff") brings this action on behalf of herself, and all others similarly situated against Target Corporation ("Defendant").

## NATURE OF THE ACTION

1. Defendant makes, sells, and markets "Up & Up" over-the-counter cough, cold and flu medicine (the "Non-Drowsy Up & Up Products" or "Products"), including generic Up & Up versions of brands like DayQuil and Robitussin.[1] Like the branded versions, these medicines contain the active ingredient Dextromethorphan Hydrobromide ("DXM"), an ingredient that causes drowsiness.

2. Defendant's Non-Drowsy Up & Up Products state prominently on the front of their label that they are "Non-Drowsy" products (juxtaposed against Defendant's night time versions that have no such claim and that are known to cause drowsiness). By prominently labeling these products as "Non-Drowsy" Defendant led Plaintiff and other consumers to believe that the Non-Drowsy Up & Up Products do not cause drowsiness, that drowsiness is not a side effect of those products. Defendant also led Plaintiff and other consumers to believe that those products are for use during the day, and can be safely and satisfactorily consumed during waking hours, at work, and while driving and operating machinery.

3. But the truth is that products containing DXM—and thus the Non-Drowsy Up & Up Products—do cause drowsiness, and that drowsiness is a known side effect of DXM (a fact not known by the average consumer). In reality, the Products cause drowsiness, which in effect destroys the primary reason for purchasing the Products in the first place – for use when consumers do *not* want to be drowsy.

4. In this way, Defendant misled Plaintiff and other consumers about the effects of the Non-Drowsy Up & Up Products. This was a material misrepresentation that Plaintiff—and other reasonable consumers—relied on when deciding to buy the products. Had Defendant been truthful, Plaintiff and other consumers would not have purchased the products or would have paid less for them.

---

[1] The Non-Drowsy Up & Up Products include all Up & Up Products sold by Defendant that are labeled "Non-Drowsy" and that contain Dextromethorphan Hydrobromide.

2

5. Plaintiff brings this case for herself and for millions of other consumers who purchased Non-Drowsy Up & Up Products.

**PARTIES**

6. Plaintiff Sherry Miner is a citizen of Nevada (domiciled in North Las Vegas). The proposed class (identified below) includes citizens of every state within the United States.

7. Defendant Target Corporation is a corporation organized and existing under the laws of the state of Minnesota, with its principal place of business Minnesota. Defendant has been doing business in the State of Nevada during all relevant times. Defendant manufactures, sells, and/or distributes Up & Up-brand products, and is responsible for the advertising, marketing, trade dress, and packaging of the Non-Drowsy Up & Up Products. Target manufactured, marketed, and sold the Non-Drowsy Up & Up Products during the class period.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from the Defendant.

9. The Court has personal jurisdiction over Defendant because it sold the Non-Drowsy Up & Up Products to consumers in Nevada, including Plaintiff.

10. Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because Defendant would be subject to personal jurisdiction in this District if this District were a separate state, given that Defendant sold the Non-Drowsy Up & Up products to consumers in this District, including Ms. Miner. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendant's conduct giving rise to the claims occurred in this District, including selling the Non-Drowsy Up & Up products to Ms. Miner.

# FACTUAL ALLEGATIONS

A.  **Defendant makes, markets, and sells Up & Up Products prominently labeled "Non-Drowsy."**

11. Target Corporation, distributes, markets, and sells the Non-Drowsy Up & Up Products.

12. The front label of each Non-Drowsy Up & Up Product prominently states that the product is "Non-Drowsy" and for "Daytime." For example:

**Up & Up Daytime Cold and Flu Multi-symptom Relief Softgels[2]**



**Up & Up Daytime Cold and Flu Multi-symptom Relief Liquid[3]**



---

[2] https://www.target.com/p/daytime-cold-38-flu-relief-softgels-24ct-up-38-up-8482/-/A-11003529#lnk=sametab

[3] https://www.target.com/p/daytime-cold-38-flu-multi-symptom-relief-liquid-12-fl-oz-up-38-up-8482/-/A-11046966#lnk=sametab

**Up & Up Maximum Strength Non-Drowsy Cough + Chest Congestion DM MAX**[4]

---

[4] https://www.target.com/p/cough-38-chest-congestion-dm-liquid-raspberry-menthol-8-fl-oz-up-38-up-8482/-/A-12980983

13. Further, the Products are sold as "Daytime" products that are meant to be consumed during the day, and offered for sale as an alternative to Defendant's Nighttime Cold & Flu Relief Products (which have no "Non-Drowsy" claim), such as the one pictured below:



14. In reality, however, the "Daytime" version causes drowsiness. Accordingly, if a reasonable consumer knew the truth, it would eviscerate the reason that consumers buy Daytime cold and flu relief products in the first place: to avoid drowsiness when they need to be alert.

15. These representations are materially the same across all Non-Drowsy Up & Up Products.

16. The Non-Drowsy Up & Up Products do not disclose anywhere on their packaging that they do or can cause drowsiness, or that drowsiness is a side effect of the Non-Drowsy Up & Up Products.

17. Based on the prominent "Non-Drowsy" and "Daytime" label included on the face of each product, a reasonable consumer would believe that the products do not cause drowsiness. That is, a reasonable consumer would believe that drowsiness is *not* a side effect of the product.

18. Indeed, Defendant labeled the products this way because it intended consumers to rely on the labels and to believe that the products would not cause drowsiness, so that consumers would buy more products or pay more for them.

**B. The Non-Drowsy Up & Up Products cause drowsiness.**

19. In truth, products containing DXM—like each of the Non-Drowsy Up & Up Products—do cause drowsiness. Drowsiness is a documented side effect of DXM at the recommended dosages. Authorities such as the National Library of Medicine [5] list drowsiness as a side effect of DXM.

20. Indeed, drowsiness is a common side effect at the recommended dosages. A study of DXM found that "[s]omnolence is a common side effect of centrally acting antitussive drugs" like dextromethorphan, and that 10.4% of users of products containing dextromethorphan develop drowsiness within three days of starting treatment with DXM cough medicine.[6] The "cases of intense somnolence" were "related only to dextromethorphan" and not to the other drug studied. And the patients in this clinical study were given an even smaller dosage of DXM (15 mg three times a day) than the recommended dose found in many Non-Drowsy Up & Up Products.[7]

21. Furthermore, the FDA's adverse event report database confirms that sedation (i.e., drowsiness) is one of the most frequently-cited side effects of dextromethorphan-containing products. [8]

---

[5] Dextromethorphan: MedlinePlus Drug Information, National Library of Medicine, https://medlineplus.gov/druginfo/meds/a682492.html (last accessed November 22, 2021).

[6] E. Catena and L. Daffonchio, "Efficacy and Tolerability of Levodropizine in Adult Patients with Non-productive Cough, Comparison with Dextromethorphan," 10 Pulmonary Pharmacology & Therapeutics 89-96 (1997). The study reports this side effect as "somnolence." Somnolence means "the quality or state of being drowsy." Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/somnolence (last accessed November 22, 2021).

[7] For example, Up & Up Daytime Cold & Flu Multi-symptom Relief Liquid contains 20 mg of DXM per 30 ml of syrup and the recommended dosage is 30 ml orally every 4 hours. https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=aeebfcb8-e3e0-4894-9355-4ecd06915906. Likewise, the Up & Up Cold & Flu Relief Softgels contain 10 mg of DXM per capsule and the recommended dosage is two capsules every 4 hours. https://www.target.com/p/daytime-cold-38-flu-relief-softgels-24ct-up-38-up-8482/-/A-11003529#lnk=sametab

[8] Sedation is associated with drowsiness. *See* IV/Monitored Sedation, American Society of Anesthesiologists, https://www.asahq.org/madeforthismoment/anesthesia-101/types-of-anesthesia/ivmonitored-sedation/ (even "minimal" sedation means that "you'll feel drowsy")

22. For this reason, the Federal Aviation Administration prohibits pilots from flying after ingesting DXM.[9]

| | Cough/cold products | Coricidin (allowed if no chlorpheniramine) | dextromethorphan (Delsym) | Most cough medications are safe for flight, but caution for combination products with sedating antihistamines. **If the label states PM (for nighttime use) or DM (containing dextromethorphan), you should not fly for at least 5 half-lives after the last dose (see above).** |
|---|---|---|---|---|
| Cough | | guaifenesin (found in Mucinex and Robitussin) Mucinex fast-max severe congestion and cough (liquid) Identify combo vs isolated | Dayquil (contains dextromethorphan) Most "night-time" or "PM" medications contain a sedating antihistamine: - Coricidin HBP cough & cold (contains chlorpheniramine) - Nyquil (contains doxylamine) | |

**C.   Defendant's Non-Drowsy representations misled reasonable consumers.**

23. The Food and Drug Administration prohibits drug labeling that is "false or misleading." 21 C.F.R. § 201.6. It is misleading to label a product "Non-Drowsy" when it does cause drowsiness, or if drowsiness is a known side effect of one of its active ingredients.

24. Defendant's false, deceptive, and misleading "Non-Drowsy" label statement violates 21 U.S.C. § 352(a)(1) and the so-called "little FDCA" statutes adopted by many states,[10] which deem a drug misbranded when "its labeling is false or misleading in any particular."

25. Further, as explained above, Defendant's claims are misleading to consumers in violation of 21 U.S.C. § 352(a)(1) which states, "[a] drug . . . shall be deemed to be misbranded . . . If its labeling is false or misleading in any particular."

26. Nevada incorporates the exact language of the FDCA in N.R.S. § 585.410 by stating, "[a] drug or device shall be deemed to be misbranded if its labeling is false or misleading in any particular."

---

[9] https://www.faa.gov/licenses_certificates/medical_certification/media/OTCMedicationsforPilots.pdf

[10] *See, e.g.*, N.R.S. § 585.410.

27. Based on the fact that Defendant labels the Non-Drowsy Up & Up Products as "Non-Drowsy," a reasonable consumer would expect that those products do not cause drowsiness. Similarly, a reasonable consumer would expect that drowsiness is not a side effect of the products. Indeed, according to Consumer Reports, "'Non-drowsy' is code for antihistamines and other medications that don't make you sleepy."[11] This is the plain meaning of "non-drowsy," which means "not causing or accompanied by drowsiness." [12]

28. Target's advertisements and labeling do not contain any language that a reasonable consumer would understand to qualify these representations, or that would otherwise put a reasonable consumer on notice of the fact that the Non-Drowsy Up & Up Products actually cause drowsiness.

29. Unlike Defendant, some other drug makers do not falsely claim that DXM-products are non-drowsy. For example, DXM is an active ingredient in Mucinex DM, sold by Reckitt. But the Mucinex label does not claim that Mucinex DM is non-drowsy, because this is not the truth:



30. Defendant could have simply omitted the false and misleading statement, "Non-Drowsy" and "Daytime" from its products.

---

[11] "How to read over the counter (OTC) drug labels," Consumer Reports, https://www.consumerreports.org/cro/2014/04/how-to-read-over-the-counter-drug-labels/index.htm
[12] https://www.merriam-webster.com/medical/nondrowsy

9

31. Or, if Defendant wanted to say something to indicate that a Non-Drowsy Up & Up Product might cause *less* drowsiness than another Up & Up product, it could have made a truthful statement to this effect, as other drug makers do.

32. For example, Dramamine contains an active ingredient that causes drowsiness, Dimenhydrinate. Dramamine also sells a "less drowsy" version that contains a different active ingredient, Meclizine, which causes less drowsiness. The front label of Dramamine Less Drowsy prominently displays that it is "less drowsy":



33. Because Defendant makes and sells the Non-Drowsy Up & Up Products, Defendant researched the known and common side effects of DXM. This is diligence that large companies like Defendant would do when selling a drug. As a result, Defendant knew that DXM causes drowsiness. Furthermore, Defendant controls its labeling, knowingly put on the "Non-Drowsy" and "Daytime" representations, and knows the plain meaning of "Non-Drowsy." Finally, it is standard practice in the industry to test labeling with consumers, and Defendant's testing would confirm that "Non-Drowsy" is misleading. For these reasons, Defendant knew that its labeling was false and misleading, or was reckless or willfully blind to this fact. And as alleged above, Defendant intended that consumers would rely on the "Non-Drowsy" and "Daytime" labeling, so that consumers would purchase more products, pay a price premium, and buy them as alternatives to its "Nightime" products.

34. Whether or not an over-the-counter drug causes drowsiness is material to a reasonable customer. In certain situations, consumers prefer over-the-counter drugs that will not make them drowsy to products that may make them drowsy. For example, all else equal, a reasonable consumer would prefer to take a drug that does not cause drowsiness to one that does cause drowsiness during the day (or any periods of time when they plan to be awake). As a second example, if a consumer is planning to engage in activities that require them to be alert, or during which they would prefer to be alert, that consumer would prefer to take a drug that does not cause drowsiness to one that does. Indeed, in many situations, taking a drug that does or can cause drowsiness can be dangerous. For example, taking a drug that causes drowsiness while driving, or flying a plane, is dangerous.

35. Defendant's false statements increased the demand for Non-Drowsy Up & Up Products and allowed Defendant to charge a price premium. As explained above, consumers specifically value the "Non-Drowsy" and "Daytime" claim because consumers demand cough medicine that will not make them drowsy (e.g., during the day, at work or while driving). As a result, Defendant was able to charge more for these products than it would have been able to had the labeling been truthful. Accordingly, as a direct result of Defendant's false statements, Defendant was able to charge a price premium for these products. As purchasers, Plaintiff and each class member paid this price premium and sustained economic injury.

**D. Plaintiff was misled by Defendant's misrepresentations.**

36. In November 2021, Plaintiff bought a bottle of Up & Up "Non-Drowsy" Daytime Cold & Flu Medication from Target in North Las Vegas, Nevada. The package said "Non-Drowsy" and "Daytime" prominently on the label, and she read and relied on those statements when purchasing the product. Accordingly, these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Up & Up "Non-Drowsy" Daytime Cold & Flu Medication on the same terms, or would not have purchased them at all, had she known these representations were not true. However, Plaintiff did not receive the benefit of her bargain because her Non-Drowsy Up & Up Product was not, in fact, "Non-Drowsy" medication or appropriate for "Daytime" use. When Plaintiff took the medication as directed by Defendant, she

became unexpectedly drowsy. She would not have bought this product had she known that the product did, in fact, cause drowsiness, and that drowsiness was a known side-effect of the product.

## CLASS ALLEGATIONS

37. Plaintiff brings the asserted claims on behalf of the proposed class of: all persons who purchased a Non-Drowsy Up & Up Product in the United States during the applicable statute of limitations (the "**Nationwide Class**").

38. For certain claims, in the alternative, Plaintiff brings those claims on behalf of a subclass of consumers who, like Plaintiff, purchased Non-Drowsy Up & Up Products in Nevada (the "**Nevada Subclass**").

39. The following people are excluded from the Class and the Subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

*Numerosity*

40. The proposed class contains members so numerous that separate joinder of each member of the class is impractical. There are millions of proposed class members.

*Commonality*

41. There are questions of law and fact common to the proposed class. Common questions of law and fact include, without limitation:

- Whether the Non-Drowsy Up & Up Products cause drowsiness;
- Whether Defendant's labelling of the Non-Drowsy Up & Up Products as "non-drowsy" and "daytime" is deceptive and misleading;
- Whether Defendant violated state consumer protection statutes;
- Whether Defendant committed a breach of express warranty; and,

12

- Damages needed to reasonably compensate Plaintiff and the proposed class.

*Typicality*

42. Plaintiff's claims are typical of the proposed class. Like the proposed class, Plaintiff purchased Non-Drowsy Up & Up Products. Like the proposed class, Plaintiff would not have purchased the products, or would have paid less for them, had she known that they cause drowsiness.

*Predominance and Superiority*

43. The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that breach of the same express warranty is found for some proposed class members, but not others.

44. Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from certain central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member. For example, a core liability question is common: whether Defendant breached an express warranty by falsely marketing products that cause drowsiness as "Non-Drowsy."

45. A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of millions of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

## CAUSE OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
(on behalf of Plaintiff, the Nationwide Class, and the Nevada Subclass)

46. Plaintiff incorporates by reference each and every factual allegation set forth above.

47. Plaintiff brings this cause of action on behalf of herself and the Nationwide Class.

13

48. Plaintiff also alleges this claim individually and on behalf of the Nevada Class.

49. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Non-Drowsy Up & Up Products, issued material, written warranties by representing that the products were "Non-Drowsy" and "Daytime" products. These were an affirmation of fact about the products (i.e., a description of the effects) and a promise relating to the goods.

50. Defendant marketed Non-Drowsy Up & Up Products to consumers, and Defendant's warranty was the basis of the bargain and was relied-upon by Plaintiff and Class members.

51. The Non-Drowsy Up & Up Products do not conform to the above-referenced representation because they cause drowsiness. Thus, the warranty was breached.

52. Plaintiff and members of the Class were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased Non-Drowsy Up & Up Products if they had known that the products cause drowsiness, and/or (b) they overpaid for the products because the products are sold at a price premium due to the warranty.

53. Plaintiff provided Defendant with notice of this breach of warranty, by mailing a notice letter to Defendant's headquarters on February 14, 2022.

**COUNT II**
**INTENTIONAL MISREPRESENTATION**
**(on behalf of Plaintiff, the Nationwide Class, and the Nevada Subclass)**

54. Plaintiff incorporates by reference the facts alleged above.

55. Plaintiff alleges this claim individually and on behalf of the Nationwide Class.

56. Plaintiff also alleges this claim individually and on behalf of the Nevada Class.

57. As alleged in detail above, Defendant's labeling represented to Plaintiff and Class members that the Products do not cause drowsiness and that drowsiness is not a side effect of these products, and that the Products are for "Daytime" use.

58. These representations were false and misleading. As alleged above, the Products do cause drowsiness and drowsiness is a documented side effect.

59. As alleged in detail above, when Defendant made these misrepresentations, it knew that they were false, was reckless to the truth, or was willfully blind.

60. Defendant intended that Plaintiff and Class members rely on these representations and Plaintiff and class members read and reasonably relied on them.

61. Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and Class members.

62. Plaintiff and Class members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known that they cause drowsiness, and/or (b) they overpaid for the products because they are sold at a price premium due to the misrepresentation.

## COUNT III
## UNJUST ENRICHMENT IN THE ALTERNATIVE
### (on behalf of Plaintiff, the Nationwide Class, and the Nevada Subclass)

63. Plaintiff incorporates by reference the facts alleged above.

64. Plaintiff alleges this claim individually and on behalf of the Nationwide Class.

65. Plaintiff also alleges this claim individually and on behalf of the Nevada Class.

66. By purchasing the Non-Drowsy Up & Up Products, Plaintiff and members of the Class conferred a benefit on Defendant in the form of the purchase price of the Products.

67. Defendant had knowledge of such benefit and Defendant appreciated the benefit because, were consumers not to purchase the Non-Drowsy Up & Up Products, Defendant would not generate revenue from the sales of the Products.

68. Defendant's knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent, misleading, and deceptive representations and omissions.

69. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Non-Drowsy Up & Up Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products,

and any interest that would have accrued on those monies, in an amount to be proven at trial.

70. Accordingly, Plaintiff seeks a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A. An order certifying the asserted claims, or issues raised, as a class action;

B. A judgment in favor of Plaintiff and the proposed classes;

C. Damages, including statutory, treble, and punitive damages where applicable;

D. Restitution;

E. Disgorgement, and other just equitable relief;

F. Pre- and post-judgment interest;

G. An injunction prohibiting Defendant's deceptive conduct, as allowed by law;

H. Reasonable attorneys' fees and costs, as allowed by law; and

I. Any additional relief that the Court deems reasonable and just.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

DATED this 1st day of March, 2022.

**KEMP JONES, LLP**

By: */s/ Don Springmeyer*
Don Springmeyer, Esq. (#1021)
3800 Howard Hughes Pkwy., 17th Floor
Las Vegas, NV 89169

**BURSOR & FISHER, P.A.**
Yeremey O. Krivoshey (*Pro Hac Vice Forthcoming*)
Brittany S. Scott (*Pro Hac Vice Forthcoming*)

|   |   |
|---|---|
| 1 | 1990 North California Blvd., Suite 940 |
| 2 | Walnut Creek, CA 94596 |

**DOVEL & LUNER, LLP**
Jonas Jacobson (*Pro Hac Vice Forthcoming*)
Simon Franzini (*Pro Hac Vice Forthcoming*)
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401

*Attorneys for Plaintiff*